IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| HEATHER PERRY,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>　　　　Defendant. | CASE NO. 1:25-cv-1738<br><br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br><br>**MEMORANDUM<br>OPINION AND ORDER** |

Plaintiff Heather Perry filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In September 2020, Perry filed an application for disability insurance benefits, alleging a disability onset date of July 19, 2016.[1] Tr. 18. In her application, Perry claimed disability due to fibromyalgia; irritable bowel syndrome; anxiety; depression; "slight" agoraphobia; chronic migraines;

---

[1]　"Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

decreased mobility, strength, and endurance; abnormal gait; and numbness and tingling. Tr. 340. The Social Security Administration denied Perry's application and her motion for reconsideration. Tr. 189, 200. Perry then requested a hearing before an Administrative Law Judge (ALJ), Tr. 227, who held a hearing in June 2022, Tr. 41–62.

Perry and a vocational expert testified during the hearing. Tr. 41–62. The next month, the ALJ issued a written decision finding that Perry was not disabled. Tr. 18–35. Perry ultimately appealed to federal court, and the parties stipulated to a remand. *See Perry v. Comm'r of Soc. Sec.*, Case No. 1:23-cv-01817 (N.D.Ohio) (remanded Feb. 14, 2024).

On remand, the Appeals Council ordered a new ALJ to re-consider the medical opinion assessed by Perry's mental health provider, Teresa Julian-Goebel, and Perry's residual functional capacity. Tr. 957. In July 2024, the ALJ issued a new written decision finding that Perry was not disabled since October 19, 2019, Perry's amended disability onset date. Tr. 957–69. The ALJ's decision became final on July 1, 2025, when the Social Security Appeals Council declined further review. Tr. 949–50; *see* 20 C.F.R. § 404.981.

Perry filed this action on August 21, 2025. Doc. 1. She asserts the following assignments of error:

> 1. Whether the ALJ erred when he discounted the medical opinions of the claimant's treatment providers as nonpersuasive.
>
> 2. Whether the ALJ erred when he rejected the medical opinion of the consultative examiner.

2

Doc. 9, at 1.

**Evidence**

*Personal and vocational evidence*

Perry was 43 years old on her amended alleged disability onset date. Tr. 190. She has a two-year business management degree, Tr. 48, and last worked in 2016 as a claims specialist, Tr. 45, 322.

*Relevant medical evidence*

Perry has a history of irritable bowel syndrome, which causes symptoms including diarrhea and cramping. Tr. 749–50.

In January 2021, Perry saw Mitchell Wax, Ph.D., for a psychological consultative exam. Tr. 626–32. When asked why she felt that she was unable to work, Perry answered that she was always in pain. Tr. 627. She was depressed, did not like being around people, and did not like leaving her house. Tr. 627. She also had constant migraines. Tr. 627. Perry reported irritation, panic attacks, and excessive sweating. Tr. 630. She said that she spent most of her day lying on the couch watching television or playing games on her phone. Tr. 628. Perry performed household chores such as loading the dishwasher, doing laundry, vacuuming, and cleaning the bathroom, although when she did "stuff like that" she was in pain for the next two days. Tr. 628. She never learned to cook, although she could scramble eggs and microwave meals. Tr. 628. She couldn't make a hamburger because she couldn't tell when it would be done. Tr. 628. Dr. Wax commented that Perry "appeared capable of making

3

a hamburger, but appeared to be making herself dependent upon others." Tr. 628. Perry told Dr. Wax that she only left her house once a month. Tr. 628–29. Perry's mother visited Perry's house about once a month but they only spoke through the door "because of COVID." Tr. 629.

Dr. Wax described Perry as anxious, depressed, and distant. Tr. 629. She was slow-talking and slow-thinking. Tr. 629. Dr. Wax commented that Perry was difficult to interview because she was "vague and circumstantial." Tr. 629. She appeared tired and fatigued, but she was in no physical distress during the exam. Tr. 629. She exhibited intermittent difficulty in focusing. Tr. 631. Perry had been in counseling but stopped about 18 months before the exam. Tr. 631. She took anti-anxiety medication prescribed by her physician. Tr. 631. Dr. Wax commented that Perry was "totally taken care of by her husband." Tr. 631. He diagnosed Perry with personality disorder with borderline features, panic disorder with agoraphobia, and major depression. Tr. 631. Dr. Wax opined that Perry could understand, remember, and carry out instructions. Tr. 632. She would have difficulty maintaining attention and concentration on a job. Tr. 632. Perry would have difficulty responding appropriately to supervisors and co-workers in a work setting, and would not respond appropriately to work pressures. Tr. 632.

In February 2021, Perry saw Dariush Saghafi, M.D., for a physical consultative exam. Tr. 634–37. Perry's main complaint was fibromyalgia, which she had been diagnosed with three years before the appointment. Tr.

4

634. Perry reported wide-spread pain, tingling, and tightness. Tr. 634. Her pain was exacerbated by vacuuming, "washing a room," stress, and anxiety. Tr. 634. Her condition caused difficulty sleeping. Tr. 634. Dr. Saghafi commented that Perry "mov[ed] quite slowly as if she were in pain[.]" Tr. 635. She was sensitive to touch in her cervical spine and shoulders, and had multiple trigger points in her spine and hips. Tr. 635. Perry had mild swelling and blanching of her hand and finger joints. Tr. 635. She had full strength in her upper and lower extremities and intact sensation. Tr. 635–36. She had no percussive tenderness over her cervical, thoracic, and lumbar spine. Tr. 636. She had a normal gait without predisposition to falls and a normal arm swing. Tr. 636.

Dr. Saghafi diagnosed Perry with "fibromyalgia vs. myofascial pain syndrome." Tr. 636. He concluded that she could lift, push, and pull sufficiently to be able to perform activities of daily living and lift up to 10 pounds. Tr. 636. Perry could bend, walk, and stand for only several minutes at a time. Tr. 636. She could understand her environment and her peers, communicate satisfactorily, and travel independently. Tr. 636.

In March 2021, Perry saw her doctor Rob Rutkowski, MD, for an office visit to obtain medication refills. Tr. 934. That day, Perry appeared well and was in no distress. Tr. 934. Follow-up visits in April and May also show that Perry appeared well and was in no distress. Tr. 935–37.

Meanwhile, in April 2021, Perry had an initial mental health

assessment via tele-health at Circle Health Services. Tr. 651. Perry reported the following depressive symptoms: sadness, guilt, hopelessness, thoughts that death would be easier, decreased interest, insomnia, psychomotor agitation, decreased hygiene, and social isolation. Tr. 658. She reported the following anxiety symptoms: decreased concentration, irritability, sleeping problems, excessive worry, fearfulness, panic, headaches, avoidance, insomnia, and difficulty focusing. Tr. 659. Perry's exam findings showed "depressive cognitions," fair insight, appropriate judgment, alert attention, unremarkable speech, grossly intact memory, and full affect. Tr. 658. Perry was cooperative and anxious, fully oriented, and had a goal-directed thought process. Tr. 658. The provider diagnosed Perry with major depressive disorder and generalized anxiety disorder. Tr. 659.

At a June 2021 gastroenterology appointment by video, Perry appeared normal, healthy, cooperative, and in no acute distress. Tr. 862. She was oriented and had a normal mood and affect. Tr. 863.

At a follow-up visit at Circle Health, Perry reported memory and attention difficulties. Tr. 655. On exam, she displayed unremarkable speech, full-range affect, a goal-directed thought process, alert attention, an anxious but cooperative demeanor, fair insight, appropriate judgment, and intact memory. Tr. 658. At a video counseling session in June with licensed social worker Teressa Julian-Goebel, Perry reported being in extreme pain from fibromyalgia and feeling trapped from depression and agoraphobia. Tr. 662.

She said that "she is unable to complete the most minor of tasks and as a result her house [is] very cluttered." Tr. 662. Perry said that she distrusts "everyone, her medical providers, her neighbors, and everyone else in the general public." Tr. 662. Julian-Goebel diagnosed Perry with agoraphobia with panic and severe major depressive disorder with psychotic features. Tr. 663. In July, Perry expressed her ongoing frustration "about her low functioning." Tr. 666. Julian-Goebel remarked that Perry "seem[ed] to improve, greater clarity/more engaged over the course of the hour." Tr. 666.

In December 2021, Julian-Goebel completed a medical source statement on Perry's behalf. Tr. 674–78. Julian-Goebel checked boxes indicating that Perry had marked or extreme limitations in most aspects of social interaction and concentration, persistence, and pace, and in some of the factors in adapting to changes. Tr. 674–75. She found that Perry had no more than moderate limitations in any area related to understanding or remembering instructions. Tr. 674. In support of these limitations, Julian-Goebel cited Perry's diagnosed agoraphobia with panic attacks. Tr. 675. Although Julian-Goebel answered all of the questions on the form, she commented that she never saw Perry in a face-to-face setting, so a "number of factors could not be assessed." Tr. 675.

In January 2022, Perry had a counseling appointment with Julian-Goebel and appeared anxious and nervous. Tr. 695. She said that she felt fearful at the thought of leaving her house. Tr. 695. At a February appointment, Perry appeared depressed and anxious. Tr. 788. She discussed

7

problems that her mother was having and Julian-Goebel counseled Perry on boundary-setting strategies. Tr. 788. Julian-Goebel remarked that Perry "seemed to be more clear headed," had "more energy," and was "much more communicative than in the past." Tr. 788.

In March 2022, Dr. Rutkowski completed a medical source statement on Perry's behalf. Tr. 793–94. Dr. Rutkowski opined that due to Perry's migraines, anxiety, and lumbar disc disease, Perry could occasionally lift and carry 10 to 20 pounds and frequently lift and carry less than 10 pounds. Tr. 793. She could stand and walk two-to-three hours total in an eight-hour day and sit for four-to-five hours total. Tr. 793. And Perry had postural limitations. Tr. 793. Dr. Rutkowski found that due to migraine triggers, Perry had environmental limitations. Tr. 794. Due to anxiety and lumbar disc disease, Perry had reaching and manipulative limitations. Tr. 794. Dr. Rutkowski opined that Perry had moderate and severe pain, which would interfere with her concentration, take her off-task, and cause absenteeism. Tr. 794. Perry would need to change positions at will and take unscheduled breaks. Tr. 794.

*State agency opinions*[2]

In February 2021, Gail Mutchler, MD, reviewed Perry's record. Tr. 191–

---

[2]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability

92, 196. Regarding Perry's physical residual functional capacity (RFC),[3] Dr. Mutchler found that Perry could stand, walk, and sit for about six hours in an eight-hour workday. Tr. 195. She could lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 195. Perry had climbing and environmental limitations. Tr. 196. In September 2021, Lynne Torello, MD, reviewed Perry's record and agreed with Dr. Mutchler's findings. Tr. 206–07.

In January 2021, Karen Terry, Ph.D., reviewed Perry's record. Tr. 191–93. Regarding Perry's mental RFC, Dr. Terry found that Perry could complete tasks that do not require a fast pace or strict production quotas. Tr. 197. She could work independently of others and have no more than superficial contact with the general public. Tr. 197. Perry could complete tasks with infrequent changes explained in advance. Tr. 198. In September 2021, Aracelis Rivera, Psy. D, reviewed Perry's record and agreed with Dr. Terry's findings. Tr. 208–09.

*Hearing testimony*

Perry, who was represented by counsel, testified at the telephonic administrative hearing held in June 2022. When asked why she was unable to

---

examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[3]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

work, Perry cited her anxiety, migraines, daily pain, and stomach issues. Tr. 46. When asked to describe a typical day, Perry said that she normally wakes up with a migraine. Tr. 48. She lies in the dark most of the day. Tr. 48. She takes medication for her migraines, which helps, but it does not make them go away. Tr. 48–49.

When asked about her anxiety, Perry stated that anxiety affects her ability to be around people and talk on the phone. Tr. 49. If someone stops by the house, they stay on the porch and talk to Perry's husband. Tr. 49–50. Perry doesn't like going places. Tr. 50. Doing so causes her panic, anxiety, and dread. Tr. 51. She doesn't leave the house for months. Tr. 50. The last time she left the house was to have blood work done. Tr. 51. She felt anxious but was able to accomplish this task. Tr. 51.

The ALJ discussed with the vocational expert Perry's past work as a claims clerk and administrative clerk. Tr. 54–56. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Perry could perform Perry's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 56–57. The vocational expert answered that such an individual could not perform Perry's past work, but could perform the following jobs: merchandise marker, routing clerk, and office helper. Tr. 57–58.

**The ALJ's Decision**

In his decision following remand, the ALJ made the following findings

of fact and conclusions of law:

> 1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2021.
>
> 2. The claimant did not engage in substantial gainful activity during the period from her amended onset date of October 19, 2019 through her date last insured of December 31, 2021 (20 CFR 404.1571 *et seq*.).
>
> 3. Through the date last insured, the claimant had the following severe impairments: fibromyalgia, depressive disorder, anxiety disorder, panic disorder, personality disorder with borderline features (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift/carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for 6 hours in an 8-hour workday. She can sit for 6 hours in an 8-hour workday. She can push/pull and use foot pedals constantly. She can frequently climb ramp and stairs, but she can never climb ladders, ropes or scaffolds. She can stoop, kneel, crouch and crawl constantly. She must avoid high concentration to extreme cold, noise, vibration, smoke, fumes, pollutants, or dust. She can never have exposure to dangerous machinery or unprotected heights. She

11

can do no complex tasks, but she can do simple (routine) tasks, which I define to mean this person has the basic mental aptitude to meet the demands of competitive, remunerative, unskilled work, include the abilities to, on a sustained basis, understand, carry out, and remember simple instructions. She can do detailed, but not complex tasks and she can make simple work-related decisions. She can respond appropriately to supervision, coworkers, and usual work situations and can deal with changes in routine work settings. She can focus attention on simple or routine work activities for at least 2 hours at a time and can stay on task at a sustained rate such as initiating and performing a task that they understand and know how to do. She can work at an appropriate and consistent pace and can complete tasks in a timely manner. She can ignore or avoid distractions while working and she can change activities or work settings without being disruptive. However, she can do no high production quotas, piece rate work or work requiring tandem tasks. She can have only superficial and occasional interactions with public, co-workers, meaning she is limited to speaking, signaling, taking instructions, asking questions and similar contact but with no arbitration, negotiation, confrontation, supervision, or commercial driving.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was … 45 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and

residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 19, 2019, the amended onset date, through December 31, 2021, the date last insured (20 CFR 404.1520(g)).

Tr. 960–69.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is

13

disabled. If not, the ALJ proceeds to the next step.

4.      What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.      Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains

14

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Perry challenges the ALJ's evaluation of opinion evidence. Doc. 9, at 13.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency;

15

treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at \*3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at \*14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

First, Perry challenges the ALJ's evaluation of counselor Julian-Goebel's opinion. Doc. 9, at 14. The ALJ considered this opinion as follows:

> The opinion of Teressa Julian-Goebel, LISW-S who completed a mental residual functional capacity

16

assessment on December 21, 2021 is not persuasive (Exhibit B9F). Ms. Goebel completed a check box form which indicated that the claimant has marked limitations in asking for help when needed, stating own point of view, initiating or sustaining conversation, keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness, ignoring or avoiding distractions while working, changing activities or work settings without being disruptive, respond to changes and manage psychologically based symptoms, and she has extreme limitations in cooperating with others, handling the conflict of others, respond to requests, suggestions, criticism, and challenges, work at an appropriate and consistent pace, complete tasks in a timely manner, work close to or with others without interrupting them or distracting them, sustain an ordinary routine and regular attendance at work, work a full day without needing more than the allotted number or length of rest periods during the day, and adapt to changes. However, while Ms. Julian-Goebel has noted that the claimant was poorly oriented, persistently fatigued and confused with irrational fears, treatment records from Circle Health as well as records from the Cleveland Clinic and the claimant's treating physician, Dr. Rutkowski, and Dr. Saghafi's findings at the consultative physical exam do not suggest that the claimant has such significant limitations but instead, these records note that the claimant appears well, is well oriented, cooperative, has normal mood and affect, unremarkable speech, goal-directed thought process, normal memory, fair insight and appropriate judgment (Exhibits B2F, pp. 16, 23; B7F, p. 3; B8F, p. 16; B14F, pp. 66-67; B15F, pp. 6, 7, 14, 15). Moreover, at the consultative exam performed by Dr. Wax, he noted that the claimant was vague and circumstantial and would not answer questions directly but she did better at providing information when queried. She also told him that she is irritable but he indicated that she did not appear irritable at the exam. In addition, she stated that she did not know how to cook but later admitted

17

> that she could microwave food. He also felt that she appeared competent to cook (Exhibit B6F). Furthermore, and perhaps most significantly, Ms. Julian-Goebel's opinion is not persuasive because she indicated that she had only treated the claimant for three months, from June 11, 2021 to September 23, 2021 so she did not have a long-term treating relationship with the claimant. She also stated that she had never seen the claimant in person (face to face) and as such, she stated that she could not assess a number of factors. As such, this also makes Ms. Julian-Goebel's opinion not persuasive

Tr. 966.

Perry argues that the ALJ "largely ignored the primary issues of supportability and consistency." Doc. 9, at 15. She contends that the "medical record supports" Julian-Goebel's opinion and cites records from other providers. *Id.* Perry submits that Julian-Goebel's findings are supported by her own treatment notes and "the findings of the other examiners who evaluated" Perry's mental health. *Id.* at 16.

As an initial matter, Perry has conflated the supportability and consistency factors. *Supportability* addresses the medical provider's own cited explanations and findings, *see* 20 C.F.R. § 416.920c(c)(1), whereas *consistency* addresses "evidence from other … sources" in the record, *see* 20 C.F.R. § 416.920c(c)(2). So when Perry cites in her brief exam findings from other providers to challenge the ALJ's supportability analysis, she addresses the wrong factor.

Nevertheless, considering Perry's arguments regardless of how she labels them, the ALJ did not "largely ignore[]" the supportability and

18

consistency factors, as Perry has alleged. The ALJ discussed *consistency* when he contrasted Julian-Goebel's opinion with other findings in the record. Tr. 966 (ALJ citing the findings by Dr. Saghafi, Dr. Wax, and treatment records from Perry's counseling office and the Cleveland Clinic). Perry disagrees with the ALJ's conclusion, Doc. 9, at 16, but she has not shown that the ALJ erred. In support of her argument, Perry relies in large part on Dr. Wax's report. Doc. 9, at 15–16. But the ALJ described Dr. Wax's opinion as "vague" and consistent with "moderate limitations," Tr. 965, a finding that Perry does not challenge.[4] Perry has not explained how Dr. Wax's *moderate* limitations would be consistent with Julian-Goebel's *extreme* findings, Tr. 675.

And the ALJ addressed *supportability* when he remarked that Julian-Goebel "stated that she could not assess a number of factors" because "she had never seen [Perry] in person (face to face)."[5] Tr. 966. *See* 20 C.F.R. § 416.920c(c)(1) ("[t]he more relevant the … supporting explanations presented

---

[4]     Perry states that the ALJ's step-three finding that Perry has "moderate" limitations in the domain of "interacting with others" and "concentrating, persisting, and maintaining pace" are not supported by the record. Doc. 9, at 16 (citing Tr. 961–62). But this portion of the ALJ's decision doesn't involve Julian-Goebel's opinion, which is the basis for Perry's challenge. In any event, the ALJ cited evidence to support the *moderate* findings at step three, Tr. 961–62, which Perry ignores.

[5]     Julian-Goebel completed the entire form and answered all of the questions the form asked. Tr. 674–75. So her comment that she "could not … assess" "a number of factors" because she had never seen Perry "face to face" is confusing because she purported to assess all of the factors. So the only conclusion one could draw from Julian-Goebel's comment is the one that the ALJ drew—Julien-Goebel undercut the support for all of the findings in her opinion.

19

by a medical source are to support … her medical opinion[] … the more persuasive the medical opinions … will be."). Perry does not address this finding.

Perry also argues that "criticism of an opinion as being contained in a checkbox form requires a more indepth analysis that the ALJ provided." Doc. 9, at 15 (citing *Kepke v. Comm'r of Soc. Sec.*, 636 Fed App'x 625, 630 (6th Cir. Jan. 12, 2016)). But the ALJ merely observed that Julian-Goebel completed a check-box form; he didn't say that this feature factored into his analysis. Tr. 966. At any rate, "it is not improper for an ALJ to take into consideration the format of a medical opinion, especially in light of other factors in the record that signal unreliability." *Kepke*, 636 F. App'x at 630. Here, the ALJ discussed "other factors in the record that signal[ed] unreliability." Tr. 966.

Next, Perry challenges the ALJ's evaluation of Dr. Saghafi's opinion. Doc. 9, at 18. The ALJ wrote:

> The opinion of Dariush Saghafi[], M.D. who performed the consultative physical examination dated February 11, 2021 is not persuasive because he indicated that the claimant is able to lift, push, pull sufficiently to be able to perform ADL's and lift up to 10 pounds but the overall evidence including Dr. Saghafi's relatively normal findings on physical exam establish that the claimant is not that limited and can perform range of light work with lifting up to 20 pounds occasionally and 10 pounds frequently. Moreover, he concluded that the claimant is able to bend, walk and stand for only up to several minutes at a time and such opinion is vague and is also not consistent with the overall evidence which notes generally normal findings on physical exam and establishes that the claimant can stand and walk for

20

> a total of six hours in an eight-hour day and would
> have no limitations with bending (Exhibit B7F).

Tr. 965. Perry submits that the ALJ's description of her physical exams "were not mostly 'normal' as" the ALJ claimed. Doc. 9, at 19. She says that she "exhibited significant recorded limitations during her physical evaluation with Dr. Saghafi." *Id*. (citing Tr. 965–67). Perry doesn't identify what "recorded limitations" she references and the transcript pages she cites are the ALJ's decision.

Dr. Saghafi's findings during the exam showed that Perry had full strength in her upper and lower extremities; intact sensation and reflexes; negative signs; and a normal gait. Tr. 635–36. She had normal muscle tone and bulk; no tremors; no percussion tenderness over her cervical through lumbar vertebral bodies; normal pulses; and normal speech, language, and memory. Tr. 635–36. Perry had mild hand and finger swelling and trigger-point tenderness in her shoulders, back, and hips. Tr. 635. Perry has not explained why she believes the ALJ's characterization of Dr. Saghafi's exam as "mostly normal" is erroneous and, on its face, the ALJ's characterization is not inaccurate.

Perry criticizes the ALJ for relying on the state agency reviewers' RFC findings instead of Dr. Saghafi's findings. Doc. 9, at 19. She claims that the state agency reviewers provided a "cursory review" of "the medical records that

were available … through November of 2021."[6] *Id*. Perry doesn't explain what about the state agency reviewers' evaluation of the evidence she believes was "cursory." She doesn't claim that they failed to evaluate evidence that was in the record at the time they reviewed it. To the extent Perry asserts that there is evidence in the record that post-dates the reviewers' opinions, she hasn't identified what that evidence is. In any event, so long as the ALJ considered any subsequent evidence and "took into account any relevant changes in [the claimant's] condition," there is no error in the ALJ's reliance upon the state agency reviewers' opinions. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). Here, the ALJ considered evidence post-dating the state agency reviewers' opinions, *see, e.g.*, Tr. 966, and Perry has not claimed otherwise.

Perry complains that the state agency reviewers did not exam her. Doc. 9, at 19. But she doesn't say why this makes their opinions inherently unreliable. Legal authority indicates otherwise. *See, e.g., Kurman v. Kijakazi*, No. 1:20-cv-1837, 2022 WL 1067568, at *7 (N.D. Ohio Jan. 13, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision") (collecting cases), *report and recommendation adopted*, 2022 WL 765072 (N.D. Ohio Mar. 14, 2022). Perry writes that the ALJ did not "compar[e] … evaluations," Doc.

---

6    Perry's date last insured is December 31, 2021, which means that Perry has to show that she became disabled before this date. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

9, at 19, but she doesn't identify legal authority requiring an ALJ to compare opinion evidence. *See Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *6 (6th Cir. June 12, 2024) ("Sallaz identifies no authority limiting ALJs to relying on a rebuttal medical opinion when [evaluating the persuasiveness of opinion evidence]"). Perry has not shown that the ALJ erred when he evaluated Dr. Saghafi's opinion.

Finally, Perry challenges the ALJ's evaluation of Dr. Rutkowski's opinion, which is as follows:

> The opinion of Rob Rutkowski, M.D. who completed a physical capacity medical source statement dated February 15, 2022 is not persuasive (Exhibit B13F). While he concluded that the claimant can lift up to 20 pounds occasionally, and would have limitations in heights, moving machinery, temperature extremes, pulmonary irritants and noise, which is consistent with the overall evidence, he also concluded that the claimant can lift less than 10 pounds frequently, stand and walk a total of two-three hours for 15 minutes, sit for four to five hours for 15 minutes, occasionally push/pull, occasionally, balance and kneel, rarely climb, stoop, crouch and crawl, frequently reach or perform fine and gross manipulation, and would require additional unscheduled breaks for two to four hours and she would be off task and such is not supported by or consistent with the overall evidence in the record including his own treatment records which establish that the claimant's physical exams are generally normal (Exhibits B14F, B15F).

Tr. 966.

Perry argues that the ALJ's analysis "is unpersuasive and misrepresents the medical evidence in the record." Doc. 9, at 17. Perry submits

that she has a "long history with chronic pain" and cites in support of her argument the findings and diagnoses of consultative examiner Dr. Saghafi. *Id.* (stating that Dr. Saghafi diagnosed Perry with fibromyalgia and a myofascial pain syndrome and found that she could lift no more than 10 pounds and bend, stand, and walk "only up to several minutes at a time") (citing Tr. 636). But the ALJ found unpersuasive Dr. Saghafi's opinion, as explained above, and Perry has not shown that the ALJ erred when evaluating Dr. Saghafi's opinion. Perry doesn't articulate any other reason why she believes the ALJ's evaluation of Dr. Rutkowski's opinion was erroneous. She has not shown that the ALJ erred.

### Conclusion

For the reasons explained above, I affirm the Commissioner's decision.


Dated: March 13, 2026

 */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

24